716 A.2d 311

**HAYFIELDS, INC.**

v.

**VALLEYS PLANNING COUNCIL, INC., et al.**

**No. 1118, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Aug. 27, 1998.

618

G. Scott Barhight (Julie D. Wright and Whiteford, Taylor & Preston, L.L.P., on the brief), Towson, for appellant.

George A. Nilson (Brett Ingerman and Piper & Marbury, L.L.P., on the brief), Baltimore, for appellees.

John C. Murphy, Baltimore, for the Society for the Preservation of Maryland Antiquities, Inc., the Nat. Trust for Historic Preservation and the Baltimore County Historical Trust, Inc., amici curiae.

Paul W. Edmondson, Gen. Counsel, and Laura S. Nelson, Asst. Gen. Counsel, Nat. Trust for Historic Preservation,

Washington, DC, for Nat. Trust for Historic Preservation, amicus curiae.

Argued before MURPHY, C.J., SALMON, J., and THURMAN H. RHODES, Judge (Specially Assigned).

SALMON, Judge.

In 1995, Hayfields, Inc. ("Hayfields"), owner of Hayfields Farm (the Farm), proposed to develop its 475–acre Baltimore County property into a residential community of single-family dwellings and a country club with an 18–hole golf course and other related facilities.

Hayfields filed a petition for special exception with the Baltimore County Zoning Commission to permit the proposed country club on the Farm. Hayfields also submitted a development plan for nearly 300 acres of the Farm, which included the country club and a portion of the residential component of the project. Valleys Planning Council, Inc., and several individually named adjacent and nearby property owners (collectively "VPC"), protested the subdivision and development of the Farm. The Zoning Commissioner granted Hayfields' petition and approved the development plan. VPC appealed.[1] The County Board of Appeals of Baltimore County (the Board) approved the petition for special exception, subject to certain conditions, and also approved the development plan but reduced from five to three the number of lots into which the property could be subdivided. The Circuit Court for Baltimore County affirmed the Board's decisions but removed two of the conditions that had been imposed.

Hayfields appealed and presents one question for our review, which we have rephrased:

Did the Board err in ruling that Hayfields could subdivide its 295–acre tract of R.C. 2–zoned land into only three lots?

VPC cross-appealed, presenting six questions:

---

1. People's Counsel for Baltimore County also appealed to the Board but is not a party to this appeal or cross-appeal.

1. Did the Board err in disregarding the adverse impact of the proposed special exception use on significant on-site resources of public importance?

2. Did the Board err in its application of *Schultz v. Pritts?*

3. Did the Board err in failing to consider the adverse impact of the proposed special exception use on the historic Hayfields Farm and National Register Historic District in which the Hayfields Farm is located?[2]

4. Did the Board incorrectly impose the burden of proof on Valleys Planning Council?

5. Did the Board properly impose certain conditions on the special exception use with respect to the golf driving range?

6. Did the Board err in concluding that the definition of "country club" as used in the Baltimore County Zoning Regulations Section 101 includes a golf course plus a multiplicity of other facilities that are open to the public?

## I. FACTS

Hayfields Farm has existed for nearly 200 years.[3] Its soil is superior to that found on other farms in the region.[4] A portion of the land is still being farmed.

---

**2.** The National Trust for Historic Preservation, the Society for the Preservation of Maryland Antiquities, Inc., and the Baltimore County Historical Trust, Inc., jointly filed an amicus brief on this issue.

**3.** Hayfields Farm earned its name from the Farm's production of prodigious crops of hay. Nicholas Bosley Merryman, *Hayfields History*, 19 *History Trails* 1, 6 (Winter 1984–85). In 1824, the Farm was selected as the "Best Cultivated Farm" by the Maryland Agricultural Society. *Id.*

**4.** According to a Baltimore County soil survey in 1995, Hayfields Farm ranked third in the County's evaluation of prime and productive soils. Letter from J. Lawrence Pilson, Department of Environmental Protection and Resource Management, to Arnold Jablon, Zoning Administration and Development Management (May 5, 1995). The two farms that ranked first and second were only 35 acres and 90 acres, respectively, whereas the tested acreage on Hayfields Farm was 288 acres. Of the

The Farm is underlain by a geological formation known as Cockeysville Marble, a large aquifer that constitutes an important source of water for wells in the area. There are some experts who believe that the Cockeysville Marble aquifer is particularly vulnerable to contamination.

Hayfields Farm is located on the northwest corner of the intersection of Interstate 83 and Shawan Road. To the east is a commercial area, to the south are residential developments, and to the north and west are agricultural communities. The Farm is the "gateway" to the rural area of Baltimore County and to the Western Run—Belfast Road National Register Historic District, a rural historic district noted for its agricultural significance. The original country home (the manor house), slaves' quarters, barns, and outbuildings were all built prior to the Civil War.[5] Baltimore County's Landmarks Preservation Commission (the LPC) has included these structures, seven in all, on its historic landmarks list. This designation provides the LPC with certain authority over proposed renovations of any listed structure. *See* Baltimore County Code §§ 26–540 through 26–555 (requiring the LPC to issue a certificate of appropriateness or notice to proceed to the building engineer prior to exterior changes being made to privately owned, landmarks-designated structures).

---

Farm's 288 acres, 95 percent of the soil was designated as prime and productive.

5. One of the Farm's owners, John Merryman, was a minor figure in Civil War history. Merryman was seized at the beginning of the Civil War by Union troops because he was suspected of blowing up a bridge to prevent Union troops from marching to Baltimore. According to Chief Justice Roger B. Taney's later opinion, Merryman was charged with "treason and rebellion," albeit without proof. *Ex parte Merryman,* 17 F. Cas. 144, 147 (D.Md.1861) (No. 9487). Merryman was imprisoned at Fort McHenry. A writ of *habeas corpus* was issued by Taney. *Id.* at 147–48. A military officer, however, "suspended the writ" and refused to produce Merryman before the Chief Justice. The Union officer claimed that he had a right to effect the suspension pursuant to authority granted to him by President Lincoln. The officer's response prompted Taney to write an exposition on the doctrine of separation of powers between the judicial and military authorities, not only with respect to *habeas corpus* proceedings, but in terms of the broader issue of interpreting and administering the laws. *Id.* at 148–53.

Hayfields' plan is to build an 18–hole golf course, driving range, clubhouse, restaurant, and other related facilities. The anticipated intensity of play at the golf course, which will be open to the public, is 45,000 rounds per year. This level of play is lower than that at other public golf courses in Baltimore County but higher than the level at almost all of the private courses in the area.[6]

VPC is concerned that development of the property will destroy invaluable agricultural and historical assets, resources that are allegedly of benefit to the general public. The premier and highly productive Farm with a history encompassing agricultural, political, and legal components is uniquely deserving of preservation, says VPC. Moreover, VPC believes that the chemicals applied to the golf course may contaminate the water in the Cockeysville Marble aquifer and nearby wells.

In terms of zoning restrictions on the land on which the Farm lies, the property is split-zoned under the County's R.C. 2 and R.C. 4 zoning classifications. Both of these zones are designated for resource conservation: R.C. 2 is zoned agricultural, and R.C. 4 is zoned for watershed protection. Although the use of land for single-family dwellings is permitted as of "right" (i.e., permitted without conditions) in both R.C. 2 and R.C. 4 zones, use of land for a country club in these zones is permissible only by special exception (i.e., permitted providing certain conditions have been met).

Prior to breaking ground on this project, the Baltimore County Code (BCC) and the Baltimore County Zoning Regulations (BCZR) required Hayfields to obtain approval from the Zoning Commissioner for the proposed country club as a special exception use. *See* BCC § 26–127; BCZR §§ 1A01.2.C and 502. In addition, the project's development plan had to be approved under the procedures detailed in BCC § 26–206. As part of this process, a development plan

---

6. This comparison must be considered approximate because the source for the County's existing courses does not provide the year the information was gathered.

that involves historically significant buildings or sites is subject to additional reviews. *See* BCC § 26–205(a)(11) and 26–207(a)(3); *see also* BCC § 26–545. Finally, approval must be requested for any variances necessary to comply with the BCZR.[7] *See* BCZR § 307.1.

## A. Petition for Special Exception and Development Plan

### 1. *Petition for Special Exception*

In the spring of 1995, Hayfields filed with Lawrence E. Schmidt, Zoning Commissioner for Baltimore County, a petition for special exception for a country club on approximately 228 acres of the Farm.[8] The petition requested the Zoning Commissioner to approve the use of the land for an 18–hole golf course open to the public, with a limited membership component; a driving range with 30 tees, 3 target greens, and nighttime lighting; a pro shop; tennis and swimming facilities; a clubhouse; a public restaurant; a banquet hall; and limited overnight accommodations. Hayfields anticipated that the Farm's manor house would become the clubhouse, restaurant, and banquet hall; the building once used as slaves' quarters would be transformed into the pro shop; and the barns would be used for storage.

The Zoning Commissioner held a five-day public hearing and heard testimony from a variety of experts in the fields of agriculture, traffic engineering, hydrology and environmental science, environmental engineering, renovation of historic buildings, and landmarks preservation. Thirteen lay witnesses, many of whom live near the site, also testified. Additionally, the Baltimore County Zoning Plans Advisory Committee, comprised of several government agencies including the Office of Planning and Zoning and the Department of

---

**7.** Whereas a special exception is a legislatively permitted use if certain conditions are met, a variance authorizes a departure from zoning regulations. *See Cromwell v. Ward,* 102 Md.App. 691, 699–703, 651 A.2d 424 (1995).

**8.** Of the 228± acres, approximately 225 acres are zoned R.C. 2 and 3.5 acres are zoned R.C. 4.

Environmental Protection and Resource Management, reviewed the zoning petition and submitted non-binding recommendations to the Zoning Commissioner.

Based on *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), Commissioner Schmidt analyzed the nature of the adverse impact associated with Hayfields' proposal. Following the Commissioner's conclusion that the impact on the locale surrounding the proposed site did not warrant the denial of the special exception, he granted Hayfields' petition and approved the site plan on June 30, 1995. VPC noted an appeal to the Board, which we discuss *infra*.

## 2. *Submission of the Development Plan*

In the spring of 1996, Hayfields submitted a development plan for Commissioner Schmidt's approval. The plan amended the number of R.C. 2 acres for the country club from approximately 225 acres to 273.1 acres and also included 21.8 acres of R.C. 2 land to be used for residential dwellings (for a total of 295 acres of R.C. 2 land incorporated in the development plan). At this time, Hayfields also filed two more zoning petitions—a petition for special hearing and a petition for variances.[9] Mr. Schmidt heard Hayfields' petitions in his capacity as Zoning Commissioner; with respect to the development plan, he acted in his capacity as Baltimore County Hearing Officer.[10] In the combined hearings, we refer to

---

9. The petition for special hearing requested an amendment to the previously approved special exception use in order to conform the site plan to the proposed development plan. Specifically, the petition for special hearing asked for permission, *inter alia*, to add 48 acres to the R.C. 2 acreage originally approved for the country club (for a total of 273.1 R.C. 2 acres).

 The petition for variances requested deviation from height and distance zoning requirements for the existing structures on Hayfields Farm.

10. The different administrative roles of Mr. Schmidt governed the standard of review applied by the Board when it reviewed his decisions on appeal. The Board reviewed the Hearing Officer's decision "on the record" but conducted a *de novo* review of the decision rendered by the Zoning Commissioner.

Commissioner Schmidt as Zoning Commissioner/Hearing Officer.

A four-day hearing was held on the development plan and the zoning issues. Testimony was presented by various witnesses, including experts who were involved in formulating the development plan, several individual property owners in the area, a land planner, and representatives from the County Department of Permits and Development Management, the Department of Environmental Protection and Resource Management, the Planning Board, the Agricultural Preservation Program, and the State Highway Administration.

The Zoning Commissioner/Hearing Officer issued an order on June 12, 1996. The order, *inter alia,* approved the development plan, permitting the creation of a total of five lots on the site. VPC noted an appeal to the Board from this order.

## B. Appeals to the Board of Appeals of Baltimore County

### 1. *Appeal from the Order Granting the Special Exception*

The Board conducted a *de novo* review of the Zoning Commissioner's grant of the special exception and heard over seven days of testimony. On August 6, 1996, Hayfields' petition for special exception was approved by the Board, subject to conditions, including restrictions that the golf practice facility/driving range: (1) is limited to use by those individuals preparing for play or completing a round of play on the golf course, and outside of this limitation, available for use by members only; and (2) is limited to 30 tees, of which no more than 15 may be in operation at any one time. VPC appealed to the Circuit Court for Baltimore County from the approval of the special exception. Hayfields also filed a petition requesting review of several of the Board's conditions.

### 2. *Appeal from the Order Approving the Development Plan*

The Board conducted an "on the record" review of the approval of the development plan. On September 12, 1996, the Board affirmed the Zoning Commissioner/Hearing Offi-

cer's approval of the development plan but ruled that only three lots can be created on the Hayfields site.

The Board disagreed with the Zoning Commissioner/Hearing Officer's conclusion that the "county club lot should be considered as the exercise of a single right of subdivision," which would give Hayfields the right to create five lots on the R.C. 2–zoned property. According to the Board, the country club is a special exception use that occupies an area of 273.1 acres, and the permissible number of lots on the remaining 21.8 acres designated for residential use is limited to two lots, for a total of three lots. Hayfields filed, in the Circuit Court for Baltimore County, a petition for review of the Board's lot limitation.

### C. Consolidated Appeal Before the Circuit Court

The Circuit Court for Baltimore County (Smith, J.) granted Hayfields' motion to consolidate the petition for review of the Board's decisions and orders in the two cases. Following a hearing, the court entered its written opinion and order on June 11, 1997, affirming the Board's approval of the petition for special exception but striking two of the conditions that the Board imposed—the restriction that the golf practice facility can be used only by those preparing for, or ending play on, the golf course and otherwise limiting use of the practice facility to members only and the restriction that only 15 tees may be in use at one time. The trial court also affirmed the Board's conditional approval of the development plan, i.e., with the three-lot limitation. Hayfields appealed and VPC cross-appealed.

We will present additional facts as necessary to resolve the issues presented.

## II. STANDARD OF REVIEW

As we stated recently in *Colao v. Prince George's County*, 109 Md.App. 431, 675 A.2d 148 (1996) (quoting *Columbia Road Citizens' Assoc. v. Montgomery County*, 98 Md.App. 695, 698, 635 A.2d 30 (1994)), *aff'd*, 346 Md. 342,

697 A.2d 96 (1997)), there are two general standards of review of a decision of a zoning board:

> In regard to findings of fact, the trial court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record; when reviewing findings of law, however, no such deference is given the agency's conclusions.

*People's Counsel v. Prosser Co.*, 119 Md.App. 150, 167–68, 704 A.2d 483, *cert. denied*, 349 Md. 494, 709 A.2d 139 (1998). We review the decision of the Board, not the decision of the trial court, *see Department of Educ. v. Shoop*, 119 Md.App. 181, 196, 704 A.2d 499, *cert. denied*, 349 Md. 495, 709 A.2d 140 (1998), and apply the standard stated in *Prosser Co.*

## III. ANALYSIS

### A. Hayfields' Appeal

To reiterate, the Zoning Commissioner/Hearing Officer approved Hayfields' development plan with five subdivision lots in the Farm's R.C. 2 acreage, one lot for the country club and four lots for residential development. The Board affirmed approval of the plan but held that the number of subdivision lots permitted in this acreage is limited to three lots, two residential lots and one lot attributed to the country club. The Board explained:

> We concur [with Mr. John Lewis, who represented the County's Department of Permits & Development Management, Zoning Review Section] that the R.C. 2 acreage designated for the golf course is not a density calculation since it does not bear any relationship to dwellings or bedrooms but, rather, is a special exception usage that occupies a designated area, and that the remainder of the R.C. 2 acreage designated for residential use carries its own density based on the expressed formula of two lots for up to 100 acres, or one lot per 50 acres.

Additionally, we concur with the portion of the Department of Permits & Development Management that an owner cannot use his acreage twice to support two different uses, i.e., a residential use permitted as of right and a special exception (such as country club). We believe that the distinction is important because of its impact and interpretation as development occurs in other R.C. 2 zones. This interpretation of the Board, we believe, is consistent with the spirit and intent of the R.C. 2 legislation.

In an R.C. 2 zone, the formula for calculating subdivision lot density, i.e., the number of lots that can be created from a given tract of land, is based on the number of acres comprising that tract. The issue presented by Hayfields requires us to determine how many of the Farm's 295 acres designated for the country club and single-family dwellings form the *gross acreage* from which the number of lots for the residential component can be derived. We must decide whether the County's zoning regulations require that the 273.1 acres approved for country club use should be excluded prior to a determination of the number of residential lots into which the balance of the R.C. 2 acreage (21.8 acres) can be divided. Two interrelated questions must be considered. First, should the 273.1 acres be subtracted from the 295 acres because the country club is a special exception use, rather than a use permitted as of right, as is the plan for single-family dwellings on the remaining 21.8 acres? Alternatively, must the 273.1 acres be subtracted because the country club is a non-residential use, in contrast with the residential use proposed on the remainder of the R.C. 2 tract, thus involving different considerations from those that otherwise would exist if *all* of the 295 acres were to be used for residential development? Resolution of these questions presents issues of law, and as such, we afford no deference to the Board's determination. *See Richmarr Holly Hills, Inc. v. American PCS, L.P.*, 117 Md.App. 607, 652, 701 A.2d 879 (1997) (citing *Lee v. Maryland Nat'l Capital Park and Planning Comm'n*, 107 Md.App. 486, 492, 668 A.2d 980 (1995), *cert. denied*, 343 Md. 333, 681 A.2d 69 (1996)).

The foundation of Hayfields' argument is that, under the plain language of BCZR § 1A01.3.B.1 through .4, it can subdivide the 295–acre tract of R.C. 2–zoned land into five lots. Under these regulations, asserts Hayfields, the acreage dedicated to the country club does not have to be removed prior to calculating the maximum number of lots that are available for the residential dwellings. Hayfields explains that the zoning regulations applicable to an R.C. 2 zone incorporate neither a distinction between residential and nonresidential uses nor a distinction between special exception uses and uses permitted as of right. According to Hayfields, there is only one formula for calculating subdivision lot density in an R.C. 2 zone, and that formula permits the subdivision lot density to be computed from the overall acreage of the tract, notwithstanding the fact that the use on one lot will be different from the use proposed for the remaining lots. In Hayfields' view, it therefore is immaterial that the country club represents a nonresidential use (versus a residential use) and a special exception use (versus a use permitted by right).

BCZR § 1A01.3.B provides, in part:

1. Subdivision lot density. No lot of record lying within an R.C. 2 zone and having a gross area of less than 2 acres may be subdivided. No such lot having a gross area between 2 and 100 acres may be divided into more than 2 lots (total), and such a lot having a gross area of more than 100 acres may be subdivided only at the rate of 1 lot for each 50 acres of gross area. . . .

BCZR § 1A01.3.B.2 through .4 provides additional restrictions. Each lot created in an R.C. 2 zone must have an area not less than one acre, BCZR § 1A01.3.B.2; no dwelling or principal structure in an R.C. 2 zone may be situated within 75 feet of the centerline of any street or within 35 feet of any lot line other than a street line, BCZR § 1A01.3.B.3; and no more than one principal dwelling is permitted on any lot in an R.C. 2 zone, BCZR § 1A01.3.B.4.

■ We agree with Hayfields that the plain language of these R.C. 2 zoning regulations does not distinguish between

residential and nonresidential uses nor between uses permitted by special exception and permitted as of right.[11] Based on the terms of BCZR § 1A01.3.B.1, the maximum yield for Hayfields is five lots. A lot of record having a gross area in excess of 100 acres may be subdivided at a rate of one lot for every 50 acres of gross area; therefore, a lot of record with a gross area of 295 acres, such as the Hayfields tract, may be subdivided into a maximum of five lots. Hayfields' plan to create five lots also meets the minimum area, setback, and dwelling limit requirement in BCZR § 1A01.3.B.2 through .4.

Because Hayfields argues that it is not required to subtract the 273.1 R.C. 2 acres dedicated to the special exception country club use for purposes of calculating the number of lots for residential development that it can create in the remaining 21.8 R.C. 2 acres, VPC asserts that Hayfields is seeking to "double use" acreage. In other words, according to VPC, Hayfields is attempting "to use the 273.1 acres *twice* to support two different uses—a residential use permitted as a matter of right and a special exception country club use." VPC states that the clear language of BCZR § 1A01.3.B.1, when read together with BCZR § 102.2, prohibits such "double use."

Under the BCZR's general requirements, BCZR § 102.2 states: "No yard space or minimum area required for a building or use shall be considered as any part of the yard space or minimum area for another building or use." VPC posits:

> [I]t is plain that a yard space that has already been dedicated to a special exception use may not also be considered as part of the minimum area to support a residential use.

---

11. Under BCZR's definitions section, "subdivision" is

> [t]he division of any tract or parcel of land ... into two or more lots, plots or other divisions of land for the purpose, whether immediate or future, of building development for rental or sale ... provided, however, that this definition of a subdivision shall not include divisions of land for agricultural purposes.

BCZR § 101. In this definition, the only relevant distinction based on "use" concerns agricultural use.

Accordingly, in the present case, the yard space dedicated to the special exception country club use (any part of the 273.1 acres) may not be considered as part of the minimum area in support of the proposed residential use of four lots in the R.C.–2 zone (200 acres).

Hayfields disputes the characterization that it is attempting to double-count acreage. So do we. We agree with Hayfields' position that BCZR § 102.2 is inapplicable to the calculation of *subdivision lot density* in an R.C. 2 zone. The prohibitions on double-using "yard space" and "minimum area" will be addressed separately.

### Yard Space

We interpret the term "yard space" as being relevant to the setback requirements of BCZR § 1A01.3.B.3.[12] Although the BCZR does not provide a definition of "yard space," "yard" is defined as "[a]ny open space located on the same lot with a building. . . . The minimum depth or width of a yard shall consist of the horizontal distance between the lot line and the nearest point of the foundation wall of the main building." BCZR § 101. Hayfields' proposal to subdivide its 295 R.C. 2–zoned acres into five lots meets all the setback requirements under BCZR § 1A01.3.B.3. And in accordance with BCZR § 102.2, each one of the five lots meets the setback requirements without using depth or width demarcations from any other lot.

### Minimum Area

With regard to the prohibition on double-using "minimum area," VPC argues that "minimum lot area" refers to the one acre minimum lot size in BCZR § 1A01.3.B.2, but "minimum area," the term used in BCZR § 102.2, refers to the gross acreage required by BCZR § 1A01.3.B.1 to divide the tract

---

12. "Setback" is "[t]he required minimum horizontal distance between the building line (as defined in Section 101) and the related front, side, or rear property line." BCZR § 101. "Building line" is "[t]he line established by law beyond which a building shall not extend." BCZR § 101.

into a given number of lots. Because 273.1 acres have already been dedicated for the country club use, VPC says that this acreage cannot be considered as part of the lot of record's gross area when contemplating the remaining subdivisions. To create four lots for *residential use,* as Hayfields wishes to do, VPC states that the "minimum area" requirement of BCZR § 1A01.3.B.1 calls for a minimum of 200 acres. We interpret BCZR § 102.2's prohibition on using minimum area to support more than one use (or building) as being relevant only to the one acre lot size requirement of BCZR § 1A01.3.B.2 and disagree with the distinction VPC makes between minimum lot area (or minimum lot size) and minimum area.

We read BCZR §§ 1A01.3.B.2 and 102.2 together as preventing a situation in which, for example, a developer proposes to use a 250–acre tract in an R.C. 2 zone to create a 248–acre golf course in conjunction with four residential lots. BCZR § 102.2 prohibits such a proposal because in order to meet the one acre minimum lot size requirement of BCZR § 1A01.3.B.2, two acres would have to be "borrowed" from the golf course lot, thus double-using acreage.

Hayfields' plan, however, meets the lot size requirement of BCZR § 1A01.3.B.2. In accordance with BCZR § 102.2, each of the five lots meets the one acre minimum without having to "borrow" acreage from one of the other lots.

### Density Requirement

Before addressing VPC's next argument, we note that both parties agree that R.C. 2 zoning regulations do not provide a method for calculating residential density as a discretional use.[13] VPC states, however, that, according to § 102.2 of the

---

13. Other zones, such as R.C. 4, R.C. 5, and D.R., explicitly differentiate between residential and nonresidential uses. In a D.R. zone, for example, nonresidential acreage must be subtracted prior to calculating residential density—residential density is determined on gross residential acreage only. Under BCZR § 1B01.2.A.1, "[t]he maximum gross residential density permitted in any one D.R. zone shall control only as applied to the total gross residential acreage within a subdivision tract,

Zoning Commission's Policy Manual, "residential density may only be calculated 'on the overall property acreage if all uses are residential.' " [14] Therefore, "to the extent there are non-residential uses on the lot, the acreage dedicated to the nonresidential use may not be considered in calculating residential density." In support of this proposition, VPC states:

[T]here is no formula for calculating residential density in the R.C.–2 zone. Instead, density in the R.C.–2 zone is determined by number of lots, as opposed to number of dwelling units. Thus, for all intents and purposes, "residential density" in the R.C.–2 zone is "subdivision lot density," particularly because only one dwelling unit is permitted per lot in the R.C.–2 zone. Thus, in making a density determination, whether it be by number of lots in the R.C.–2 zone or by number of dwelling units in the D.R. zone, a developer should not be permitted to "double use" acreage to achieve

and shall not apply to or establish minimum areas of lots created by subdivision within such tract." Accordingly, to calculate residential density for a tract that is zoned D.R. 3.5, with a gross residential acreage of 100 acres, the developer would multiply 3.5 (the number of residential density units permitted per acre) by 100 (the total residential acreage) to arrive at 350 residential density units for that tract of land. (A "density unit" is "[a]n expression of extent or density of dwelling use as related to number of rooms in, or type of, dwelling unit." BCZR § 101.)

14. Section 102.2.A of the Zoning Commission's Policy Manual states, in pertinent part:

 1. If several uses are proposed as separate structures on one property, each use must meet the zoning requirements as if it was a separate parcel.

 2. Even if subdivision of the property is not proposed, the Zoning Commissioner may require that a line of division either a lease line or a zoning use division line between each use be shown on the plat.

 a. *Conditions:* The following guidelines have been formulated so that this matter can be handled consistently:

 i. Both existing and proposed uses, as divided, must be able to meet the B.C.Z.R. requirements with respect to area, density, parking, setbacks between buildings and to the division lines as if they were property lines.

 ii. Residential density may be calculated on the overall property acreage if all uses are residential and is allowed in that zone.

a higher density than contemplated by the Zoning Regulations.

(Citation to record extract and footnote omitted.)

Once again, we agree with Hayfields' response to VPC's position. Hayfields explains:

As the language of the relevant BCZR sections indicates, the calculation of residential density determines *the number of residential density units* which may be developed on a single tract of land; by contrast, the calculation of subdivision lot density determines *the number of lots* which may be subdivided from a lot of record in the R.C. 2 zone.... [VPC's] interpretation ignores the fact that, unlike the calculation of "residential density," the calculation of "subdivision lot density" does not contemplate subdivision based on distinctions among land uses; the subdivision lot density calculation does not consider the land uses which will be developed on the subdivided lots.

Moreover, VPC's reliance upon the Zoning Commission's Policy Manual § 102.2.A is misplaced. This section applies to a situation in which two uses are proposed on the same lot. In the case before us, Hayfields' development plan proposes only one use for each of the five lots created from the subdivision of the 295–acre, R.C. 2–zoned portion of the development site. The 273.1–acre lot is allocated to the country club and the remaining four lots will be developed into single-family residences.

### Deference to Agency Interpretation

VPC also argues that, under *Morris v. Prince George's County*, 319 Md. 597, 613, 573 A.2d 1346 (1990) (holding that in the face of legislative acquiescence a longstanding administrative interpretation is presumed to be correct), the Board properly gave deference to the testimony of Mr. John Lewis, a planner with the County's Department of Permits and Development Management (the PDM). Mr. Lewis testified before the Zoning Commissioner/Hearing Officer that the consistent practice of the PDM and the County generally, extending over

the last ten years, is that a property owner cannot "use his acreage twice" to support two different uses, such as residential uses permitted as of right, on the one hand, and special exception uses such as a country club, on the other. To this Hayfields retorts that, if the Board should afford deference to an agency representative's interpretation, it should afford deference to the decision of the Zoning Commissioner/Hearing Officer.[15]

Assuming, *arguendo*, that the longstanding, consistent practices of the PDM and the County generally should be given deference, there was insufficient evidence in the record of a "longstanding and consistent practice of the PDM." As Hayfields points out, the two cases cited by Mr. Lewis to show PDM's interpretation do not in fact demonstrate a longstanding agency practice of subtracting special exception acreage prior to calculating residential subdivision lot density in an R.C. 2 zone.[16]

### Legislative Purpose

VPC's final argument is that "double use" of acreage in determining subdivision lot density is inconsistent with the legislative purpose of the R.C. 2 zoning classification. The resource conservation zone's purpose is to "protect both natural and man-made resources from compromising effects of specific forms and densities of development." BCZR § 1A00.2(c). We reject VPC's argument because, paradoxically, the formula for calculating subdivision lot density advocated by VPC may result in the creation of a greater number of lots compared with the result achieved under the formula we

---

**15.** Hayfields cites to BCZR §§ 500.6 and 500.7 for this proposition. These sections give the Zoning Commissioner the power to conduct hearings involving the proper interpretation of zoning regulations and to pass orders necessary for the proper enforcement of such regulations.

**16.** Mr. Lewis cited to the *Caves Valley* and *Pickersgill* cases. During his testimony, he conceded that he did not believe that the application of the policy to which he testified was contested in *Caves Valley* and that *Pickersgill* involved land that was zoned D.R., not R.C. 2.

hold as correct. For example, a development plan for a 295–acre tract may designate 15 acres for use as a private school (a special exception use in an R.C. 2 zone) and 280 acres for use as single-family dwellings. With the approval of the special exception use, the acreage for the residential component could thereafter be subdivided into five lots, for a total of six lots under VPC's formulation. "Our" formula would allow, of course, a maximum of five lots.

In summary, according to the plain language of BCZR § 1A01.3.B.1 through .4, the area for a special exception use in an R.C. 2–zoned property should not be removed prior to the calculation of subdivision lot density even though the development plan calls for residential use on the remaining acreage. The method for calculating subdivision lot density in an R.C. 2 zone is not analogous to that for calculating residential density in other zones. Instead, R.C. 2 zone subdivisions are created purely on available acreage under the formula previously stated, subject only to other special limitations, such as minimum lot size and set back. The Board erred in reversing the Zoning Commissioner/Hearing Officer's order.

## B. VPC's Cross–Appeal

### 1. *Background*

■ "Zoning is the legislative division of a community into areas in each of which only certain designated uses of land are permitted so that the community may develop in an orderly manner in accordance with a comprehensive plan." [17] 1 E.C. Yokley, *Zoning Law and Practice* § 2–1, at 15–16 (4th ed.1978) (footnote omitted). Within any given zoning classification, the BCZR prescribes two types of uses: certain uses are permitted as of right and others are conditionally permissible. Golf courses and country clubs are conditionally per-

---

17. In Baltimore County, "[f]or the purpose of promoting the health, security, comfort, convenience, prosperity, orderly development, and other aspects of the general welfare of the community, zones are intended to provide broad regulation of the use and manner of use of land, in accordance with comprehensive plans." BCZR § 100.1.A.1.

missible uses in the County's R.C. 2 zones, BCZR § 1A01.2.C.10, and also in the R.C. 4 zones, BCZR § 1A03.3.B.7.

 A use permitted as of right may be developed, as a matter of zoning, regardless of the kind and extent of adverse impact (from a land use perspective) it will create in the particular location proposed. *Schultz, supra,* 291 Md. at 21, 432 A.2d 1319. On the other hand, a conditional use, i.e., a use permitted by special exception, may be developed only under certain circumstances. *Id.* at 22, 432 A.2d 1319. In *Schultz,* the Court of Appeals noted:

> The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption.*

*Id.* at 11, 432 A.2d 1319; *see also Rockville Fuel & Feed Co. v. Board of Appeals,* 257 Md. 183, 187–88, 262 A.2d 499 (1970); *People's Counsel v. Mangione,* 85 Md.App. 738, 747–48, 584 A.2d 1318 (1991); *Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716 (1974). More recently this Court said in *Mossburg v. Montgomery County,* 107 Md.App. 1, 666 A.2d 1253 (1995), *cert. denied,* 341 Md. 649, 672 A.2d 623 (1996), that

> a special exception/conditional use in a zoning ordinance recognizes that the legislative body of a representative government has made a policy decision for all of the inhabitants of the particular governmental jurisdiction, and that the exception or use is desirable and necessary in its zoning planning *provided certain standards are met.*

*Id.* at 7–8, 666 A.2d 1253 (emphasis added). In the instant case, the standards that must be met are found in BCZR §§ 1A01.2.C and 502.1.

BCZR § 1A01.2.C provides that a petition for special exception use may be granted in an R.C. 2 zone if "the hearing

authority empowered to hear the petition finds that the use would not be detrimental to the primary agricultural uses in its vicinity." BCZR § 502.1 lists eight factors that negate a special exception's presumption of validity. Only two of the eight factors in BCZR § 502.1 are raised in this appeal. Under BCZR § 502.1:

—Before any Special Exception may be granted, it must appear that the use for which the Special Exception is requested will not:

a. Be detrimental to the health, safety, or general welfare of the locality involved; [nor]

\* \* \*

g. Be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these zoning regulations.[18]

By definition, each special exception use carries with it a potential to cause adverse effects. If no constraint were placed on BCZR § 502.1(a), in particular, when evaluating the acceptability of a special exception use, few special exceptions would be granted. Precedent has developed to govern the application of factors, such as those in BCZR § 502.1, in analyzing the propriety of a special exception use in a particular location. As stated in *Mossburg*, "[b]y reason of the holdings in *Schultz, supra,* and its progeny, such general conditions as are applied to special exceptions are themselves subject to the limitation that the adverse effects must be

---

**18.** The remaining factors in BCZR § 502.1 are:

b. Tend to create congestion in roads, streets or alleys therein;

c. Create a potential hazard from fire, panic or other dangers;

d. Tend to overcrowd land and cause undue concentration of population;

e. Interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences, or improvements;

f. Interfere with adequate light and air;

\* \* \*

h. Be inconsistent with the impermeable surface and vegetative retention provisions of these zoning regulations.

greater than or above and beyond the effects normally inherent with such a use anywhere within the relevant zones in the regional district." *Mossburg, supra,* 107 Md.App. at 21, 666 A.2d 1253.

In *Mossburg,* Judge Cathell for this Court provided an example of how to "overlay" the statutory conditions of a county's special exception law with the restrictions in *Schultz. Mossburg,* 107 Md.App. at 21–22, 666 A.2d 1253. Based on the *Mossburg* example, we have added the limiting language of *Schultz* to BCZR § 502.1(a). The test becomes:

—Before any Special Exception may be granted, it must appear that the use for which the Special Exception is requested will not:

a. Be [more] detrimental to the health, safety, or general welfare of the *locality* involved [than the effects normally inherent with such a use would be generally elsewhere in the zone].

(Emphasis added.) We have thus far not discussed the extent or limitation of the term "locality," as used in BCZR § 502.1(a). This issue is addressed in the next subsection.

2. *On–Site Impact of Proposed Special Exception Use*

The parties disagree on the appropriate method of evaluating Hayfields' proposal under BCZR § 502.1, in light of *Schultz.* VPC argues that the adverse impacts analysis must not only consider off-site impact, i.e., impact to the surrounding and neighboring properties, but must include an examination of on-site impact, i.e., adverse impact to the subject property itself. Hayfields counters that *Schultz* mandates the evaluation of off-site impacts only. The difference in the parties' interpretations is of particular significance in the instant case because of the Farm's unique agricultural and historical character.

In response to Hayfields' petition for special exception, Commissioner Schmidt opined:

Whether the Hayfields property should remain a farm is irrelevant, *within the context of this case.* It does not

matter whether the Hayfields property represents the most significant farm in Baltimore County.... The test for approval of the use, and the only test, is whether the special exception criteria within Section 502.1 of the B.C.Z.R. are satisfied.

The Zoning Commissioner concluded that *Schultz* and its progeny require that he "adjudge the impacts of the use on neighboring properties, only" and that the potential impacts on the subject property itself are not to be considered.[19]

The Board agreed. VPC disagrees with the Zoning Commissioner's interpretation of *Schultz* and claims that the Board misunderstood the requirements for approving a special exception use.

In the previous subsection, we have introduced the *Schultz* holding that

the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*Schultz*, 291 Md. at 22–23, 432 A.2d 1319. In reaching its decision, the Court discussed *Deen v. Baltimore Gas & Elec. Co.*, 240 Md. 317, 330–31, 214 A.2d 146 (1965) (concerning construction of high tension transmission wires above ground) and *Anderson, supra*, 23 Md.App. at 617–18, 329 A.2d 716 (concerning construction of a funeral home in a residential zone), and explained:

These cases establish that a special exception use has an adverse effect and must be denied when it is determined from the facts and circumstances that the grant of the

---

19. Commissioner Schmidt opined that testimony regarding the prime and productive soils on Hayfields Farm "miss[ed] the point as far as this special exception is concerned" because Hayfields cannot be forced to farm the property.

requested special exception use would result in an *adverse effect upon adjoining and surrounding properties unique and different* from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone.

*Schultz,* 291 Md. at 15, 432 A.2d 1319 (emphasis added). *Deen* and *Anderson* both involved proposed special exception uses in Baltimore County. BCZR § 502.1(a) was at issue in those two cases, as it is here.

Although conceding that the holding in *Schultz* speaks of off-site effects, VPC stresses that the test articulated by the *Schultz* Court comparing the "particular location" with the area elsewhere in the zone should not be limited to off-site effects. In an attempt to distinguish the instant case from *Schultz* and cases that have followed *Schultz,* VPC postulates:

> The only reason that the Court in *Schultz* spoke at all in terms of adverse effects on adjoining or neighboring properties was because those happened to be the kinds of effects that were relied upon by the protestants in *Schultz.* The same is true of both the cases cited by the Court in *Schultz,* and the cases decided subsequent to *Schultz.* In none of these cases were any "unique" qualities intrinsic to the site alleged to be adversely impacted by the proposed conditional use. However, the fact that the effects cited by the protestants in *Schultz* and other appellate cases were effects on adjoining properties does not mean that the special exception test should not take into account, where appropriate, adverse impacts which will occur on the property that is the subject of the application.

From VPC's viewpoint, the development of the Farm will result in a loss of unique on-site resources, such as the Farm's prime and productive soils and its value as an historic site, both of which are *public* resources. VPC observes that the legislature, by creating the R.C. 2 zoning classification, has declared explicitly that agricultural resources are of value to

the general public.[20] VPC's appraisal continues with the following:

The Board's erroneous exclusion of adverse impacts on the property itself occurred because the Board failed to appreciate the difference between impacts on resources of admitted public importance or significance (which may be found either on or off site) and "private" impacts on the value or use of neighboring properties.... The Board erred in only considering the private impacts on adjoining properties, and by failing to consider the loss of important agricultural and historical resources within the four corners of the property itself. When an important public resource is harmed, even where the resource is located on the special exception site itself, everyone is harmed—including both the general public and the owners of other properties in the locality. Evidence of such harm cannot be ignored by the

---

**20.** In its brief, VPC cites three regulations that attest to the importance of agriculture in Baltimore County: BCZR §§ 1A01.1.A, 1A01.1.B, and 1A01.2.A.

BCZR § 1A01.1 provides, *inter alia:*
A. Legislative Statement of Findings [for R.C. 2 zones].
2. Declaration of findings. It is found:
a. that Baltimore County is fortunate in that it is endowed with a variety of very productive agricultural soil types which should not be lost unnecessarily to urbanized development;
 * * *
d. that continued urban intrusion into productive agricultural areas not only destroys the specific area upon which the development occurs but is incompatible with the agricultural use of the surrounding area;
 * * *
g. that Baltimore County possesses numerous areas which are highly suitable for urban development including residential subdivisions which are not located in areas of productive agricultural land.
BCZR § 1A01.1.B states:
The R.C. 2 zoning classification is established pursuant to the legislative findings above in order to foster conditions favorable to a continued agricultural use of the productive agricultural areas of Baltimore County by preventing incompatible forms and degrees of urban uses.
BCZR § 1A01.2.A declares that "[a]gricultural operations ... shall be afforded preferential treatment over and above all other permitted uses in R.C. 2 zones."

Board, but must be evaluated as a part of the special exception process.

(Footnote omitted.)

Due to the alleged threat to public resources on the Farm itself, VPC argues that the *Schultz* test should be applied in a different manner in the instant case.[21] VPC's theory furnishes two categories of on-site impacts that the Board needed to consider but did not:

*Characteristics of the specific proposal* which are unusual or not generic to the type of facility, and which arguably result in unusual detriments, must be considered, and *features of the particular sites* or areas selected which are not commonly or routinely found throughout the zone and which thus pose unusual detriments specific to the facility or site under review can and must be considered in applying the standards of both Section 502.1 and Section 1A01.2.C.

(Emphasis added.) VPC provides the following as an example of "characteristics of the specific proposal." According to VPC, the projected level of play at the proposed golf course is nearly twice as high as the overall average rounds played at private 18–hole golf courses in the County. Given the fact that the proposed golf course allegedly is atypical in generated activity when compared with a "generic golf course," VPC contends that any potential on-site detriments to the Farm resulting from the golf course's atypical level of activity should be examined. Under the second category, "features of the particular site," VPC states that any detriments to the Farm's uncommonly productive soil and its unusually rich historical significance should be evaluated.

VPC presents an interesting approach to the law of special exceptions, but it cites no case that supports its position. On the contrary, numerous cases support the proposition that the Board was correct in looking only at the off-site effects of the

---

**21.** VPC acknowledges that "the analysis set forth in *Schultz v. Pritts* does not require the Board to consider a potentially adverse impact to a purely private on-site resource when evaluating a proposed special exception."

proposed special exception use. For applications of the *Schultz* test, see *Harford County v. Earl E. Preston, Jr., Inc.*, 322 Md. 493, 505, 588 A.2d 772 (1991) (finding that "[t]he Board ... made no attempt to reconcile the contradictory findings of fact by its hearing examiner in his two reports as to whether the adverse impacts *upon the neighborhood* of the [applicant's] proposed special exception uses were beyond those inherently associated with such special exception uses irrespective of their location within the AG zone" (emphasis added)); *Board of County Comm'rs v. Holbrook*, 314 Md. 210, 217–18, 550 A.2d 664 (1988) ("[W]here the facts and circumstances indicate that the particular special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone, the [special exception] application should be denied."); *Evans v. Shore Communications, Inc.*, 112 Md.App. 284, 304, 685 A.2d 454 (1996) (holding that "[a]ssuming, *arguendo*, that appellant has produced evidence that the [antenna] tower will result in an adverse impact on the surrounding properties, the Board was ... obliged to make a finding that the adverse effects would be greater in the proposed location than they would generally be elsewhere within the areas of the county where they may be established"); *Mossburg*, 107 Md.App. at 13, 666 A.2d 1253 (stating that in reviewing the Board's decision, the Court "look[s] for evidence, if any, in the record of the adverse effects and impact that could generally be expected as an inherent adverse impact anywhere in the I–2 Zones in order to determine whether the environmental and traffic safety impact at the subject site is greater" [22]); *Moseman v. County*

---

**22.** Although our quote from the *Mossburg* Court speaks in terms of "subject site" rather than "surrounding and neighboring properties," the Court's opinion cited to *Schultz* and to *Sharp v. Board of Appeals*, 98 Md.App. 57, 632 A.2d 248 (1993) (discussing *Schultz's* emphasis of *Deen* and *Anderson*, the cases upon which *Schultz* formulated its holding). *Mossburg*, 107 Md.App. at 8–11, 666 A.2d 1253. Following these citations, the Court's analysis focused on off-site environmental and traffic safety concerns.

*Council,* 99 Md.App. 258, 264, 636 A.2d 499 (citing *Schultz* for the proposition that the proposed use cannot have "any adverse [e]ffect above and beyond those inherently associated with such a special exception use irrespective of its location in the permitted zone"), *cert. denied,* 335 Md. 229, 643 A.2d 383 (1994); *Sharp,* 98 Md.App. at 86–87, 632 A.2d 248 (holding, *inter alia,* that "[t]he Board had before it substantial evidence to support its finding that potential dangers from airplane crashes were such a remote possibility as not to constitute an adverse effect to the owners of *vicinal properties* " (emphasis added)); *Mangione, supra,* 85 Md.App. at 750, 584 A.2d 1318 (stating that the Court "shall review facts and circumstances upon which the Board could have found that the special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone").

■ Additionally, as the *Schultz* Court noted, "The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the [comprehensive] plan." *Schultz,* 291 Md. at 11, 432 A.2d 1319. Five of the seven cases we cited above directly quote this portion of *Schultz* that establishes the Board's duties in its judicial review of the grant or denial of a special exception use. *See Preston,* 322 Md. at 498, 588 A.2d 772; *Holbrook,* 314 Md. at 216, 550 A.2d 664; *Evans,* 112 Md.App. at 302, 685 A.2d 454; *Sharp,* 98 Md.App. at 76, 632 A.2d 248; *Mangione,* 85 Md.App. at 748, 584 A.2d 1318. Furthermore, none of the seven cases suggests that, in certain circumstances, an additional duty of the Board may involve the examination of on-site impacts under the *Schultz* test. We hold that absent a stricter standard clearly expressed in the County's zoning regulations, or until the relevant case law is modified by the Court of Appeals, the current expression of the *Schultz* test applies.

We agree with Hayfields' contention that "although the adverse impacts considered by the Board vary according to the special exception use requested, the 'adverse effect analysis,' i.e., the *Schultz* review standard, used by the Board when evaluating adverse impacts, necessarily remains constant." The Board, therefore, correctly limited its adverse impacts analysis under BCZR § 502.1, as modified by the language in *Schultz*, to off-site effects.

Nothing in the BCZR contradicts our conclusion that off-site impact is the only type of impact for which the Board should scrutinize the proposed special exception use. In fact, BCZR § 1A01.2.C, which lists the uses permitted by special exception in an R.C. 2 zone, offers additional support for our holding. The regulation permits the grant of a special exception for specified uses in an R.C. 2 zone only if "the use would not be detrimental to the primary agricultural uses *in its vicinity*." [23] (Emphasis added.) We contrast this

**23.** VPC claims that the Board never made an explicit finding regarding BCZR § 1A01.2.C. Rejecting the testimony of VPC's expert, Thomas L. Daniels, on the "impermanence syndrome," a domino-type effect where the development of one farm triggers reduced investment by other farmers in their farms, the Board found that "the effects of development have already been realized in the vicinity." Although a cite to BCZR § 1A01.2.C was lacking in this portion of the Board's opinion, this discussion by the Board fulfills the requirement that the Board must find that the proposed country club would not be detrimental to the agricultural uses in the vicinity.

Again regarding agricultural issues, VPC argues in a footnote in its brief that the Board's finding under BCZR § 502.1(g) is erroneous. Because VPC makes its argument in terms of on-site effects, we could decline to address this issue, given the fact that purely on-site matters are irrelevant. Nevertheless, we note that VPC's argument (before the Board) began from the premise that the country club is an *urban* use. There was substantial evidence to support the Board's finding that, contrary to VPC's argument, the project is consistent with the purposes of the property's zoning classification and with the spirit and intent of the zoning regulations, as required by BCZR § 502.1(g). The legislative statement of findings for R.C. 2 zones and the legislative purpose in creating R.C. 2 zones stress the problems of intrusion of *urban* development into agricultural land. BCZR §§ 1A01.1.A.1, 1A01.1.B. In its opinion, the Board cited to testimony from Hayfields' expert, George E. Gavrelis, that the "overwhelming majority of the space will remain open" and the "use is a non-intensive, non-urban use."

condition[24] with the additional conditions placed on special exception uses listed in Item 24 of BCZR § 1A01.2.C. Uses under Item 24 include the following as principal commercial uses: farm-machinery sales, feed or grain mills, fertilizer sales or storage uses, and others. A special exception may be granted for a use under Item 24 if "the use would support the primary agricultural use in its vicinity and would not itself be situated on land more appropriately used for primary agricultural uses." BCZR § 1A01.2.C. Under BCZR § 1A01.2.C., on-site impact to agricultural use should be considered only for a very limited number of special exception uses, which are found under Item 24; a country club use is *not* included among the uses so specified.

### 3. *Board's Application of Schultz v. Pritts to Off–Site Environmental Effects*

VPC also argues that the Board's analysis of the country club's potential adverse impact on the Cockeysville Marble aquifer demonstrates the Board's "misunderstanding and misapplication" of the *Schultz* test with respect to off-site matters. As we have noted, this aquifer is one of the best sources of groundwater in the locality. Under BCZR § 502.1(a) and *Schultz,* the special exception use cannot be granted if the proposed country club use is more detrimental to the health, safety, or general welfare of properties adjoining and surrounding the selected site than a country club would be if it were located elsewhere in the R.C. 2 zone.

VPC's expert, Stephen L. Mogilnicki, testified that the Cockeysville Marble weathers irregularly, resulting in "solution cavities" that "tend to carry or allow the passage of contaminants further and at faster velocity" compared with other formations. According to Hayfields' expert, Stephanie

---

**24.** "Vicinity" is: "1. the area or region near or about a place; surrounding district; neighborhood: *There are no stores in the vicinity of our house.* 2. state or fact of being near; proximity; propinquity: *He was troubled by the vicinity of the nuclear testing area." Webster's Encyclopedic Unabridged Dictionary* 1591 (1989). This definition makes it clear that "vicinity" means "off-site."

N. Hau, however, there is a clay layer that overlays the Cockeysville Marble that acts as a filter to prevent or retard the flow of any contaminants into the aquifer below. Ms. Hau stated that the presence of the clay "slow[s] down the infiltration of rain water, allowing natural microbial processes to break down and essentially eat the nitrate [from fertilizers] that would get into the groundwater system and pesticides."

The Board stated:

The bulk of scientific testimony concerning subsoil effects of the proposed use comes from Ms. Hau,[25] Mr. Mogilnicki,[26] and Dr. [William P.] Ball.[27] Ms. Hau provided information concerning subsurface conditions and proposed well locations, with references to the Environmental Impact Report, construction monitoring plan, and other work to be performed as part of the development process, i.e., mowing plans, integrated pest management plans, etc. A single well is expected to accommodate the entire project, that well being located centrally in the site and to the south of an on-site ridge line, whereas other well/septic systems generally are located to the north of that same ridge line. Ms. Hau opined that there would be no impact on groundwater in wells on or near the property. She also provided an interesting look at the public's perception of golf courses as being a 'toxic waste dump,' pointing out that golf courses are not simply blanketed with chemicals. She described

---

25. As Hayfields' expert in environmental sciences, hydrogeology, and the environmental effect of golf courses, Ms. Hau was the principal in the firm Chesapeake Environmental Management, Inc., the company that prepared the Environmental Impact Report for Hayfields on its proposal to locate the golf course on the Farm.

26. A geohydrologist advisor for the groundwater management section of Baltimore County's Department of Environmental Protection and Resource Management, Mr. Mogilnicki testified on VPC's behalf as an expert in geology, hydrogeology, and groundwater issues, including issues relating to the impact of golf courses and other development on groundwater quality and quantity.

27. Dr. Ball testified for VPC as an expert in environmental engineering, specializing in the nature and transport of chemical substances in the subsurface environment.

subsurface conditions as including a relatively consistent clay layer between the surface and the underlying Cockeysville marble and other formations, this point being somewhat strongly contested by Dr. Ball. In light of Dr. Ball's testimony, and Mr. Mogilnicki's, concerning the effects of contaminant percolation to the subsurface formations, the Board recognizes that the clay layer is both desirable and universally used to mitigate such concerns. The question for the Board is whether the impacts associated with the proposed use are greater here than elsewhere in the R.C. 2 zone. *It is this Board's view that, while it is debatable whether the Cockeysville marble or other formations are more or less susceptible to contaminants than other formations, those same formations are found elsewhere in the R.C. 2 zone. Therefore, the Board finds there was insufficient evidence that the potential effects on the subsurface formations and groundwater would be greater at the instant site than elsewhere in the zone.*

*In light of the proposed well and septic field locations being leeward of other wells to the north of the on-site ridge, as well as the acknowledgment by [p]rotestants' witnesses that the existence of clay improves the possibility for microbial action to occur in mitigating some of the concerns related to the contaminants, this Board believes that the proposed site is no worse than elsewhere in the R.C. zone. The effects of the well on neighboring properties were not demonstrated as likely to be worse here than at other locations in the R.C. zone.* Therefore, this Board finds that there was insufficient evidence that the proposed use would have a greater detrimental impact to the health or safety of the vicinity at this location.

(Emphasis added.)

In regard to the effect of the proposed golf course on the aquifer, the experts disagreed as to the first three of the following four questions, *viz:*

1. Is the quality of the groundwater protected by a clay layer to such an extent that, by the clay layer alone or in

conjunction with implementation of the golf course management plan developed for the property, there would be no adverse impact to the aquifer in the proposed location? [28]

2. Would the clay layer protect the Cockeysville Marble aquifer to such an extent that components of fertilizers, pesticides, and other chemicals used on the golf course are no more likely to reach the aquifer and pollute the groundwater than if the golf course was underlain by another type of soil layer? [29]

3. Is the Cockeysville Marble more susceptible to contamination than other rock formations in the R.C. 2 zone? [30]

4. What percentage of the remainder of the R.C. 2 zone is underlain by Cockeysville Marble?

The Board did not resolve the first question. The Board strongly implied that it believed that the clay layer testified to

---

**28.** Ms. Hau testified that "our analysis at the Hayfields property is that there is a minimal possibility of contamination of streams or groundwater ... from the golf course if the golf course is managed properly."

Evidence was also presented in the form of an Environmental Impact Report prepared for Hayfields by Chesapeake Environmental Management, Inc. This report represented that "[t]he potential for adverse impacts to the quality of groundwater resulting from the use of chemicals on the golf course is low" and that "[t]he assessment of potential environmental effects of the proposed Hayfields Manor Golf Course indicate[s] that the golf course will not have adverse impacts to the groundwater." According to the report, these conclusions were drawn from the fact that implementation of the golf course management plan would offer the "greatest protection to the aquifer from potential contamination associated with chemical use on the golf course" and the clay layer in the soils overlaying the Cockeysville Marble would be a second line of defense.

**29.** The following testimony was presented by Ms. Hau:
Q. With regard to this potential contamination issue that you've just described, are these impacts any greater than you would ordinarily expect regardless of the location of the proposed golf course elsewhere in the RC–2 and RC–4 zones?
A. I think with the presence of the clay layer arrangement that the impact on this property would be less than in other areas. I would also venture to say that certainly the impacts would not be greater on this property.

**30.** Ms. Hau testified, "In my professional opinion, the Cockeysville Marble is no more susceptible to contamination than any other fractured rock unit in Baltimore County."

by Ms. Hau at least helped in lessening the danger to water quality caused by possible contaminants from the golf course. The Board noted that even VPC's witnesses acknowledged "that the existence of clay improves the possibility for microbial action to occur in mitigating some of the concerns related to the contaminants." Although the Board recited Ms. Hau's testimony that, in her opinion, "there would be no impact on groundwater in wells on or near the property" caused by the proposed golf course, the Board did not say whether it credited that testimony.[31]

The Board made no comparison, such as stated in question two, as to whether the adverse effect on the groundwater from the golf course chemicals would be worse at the proposed site as compared with the area generally in the R.C. 2 zone. In regard to question three, the Board merely said that the issue was debatable (i.e., "it is debatable whether the Cockeysville [M]arble or other formations are more or less susceptible to contaminants than other formations").

▮ Rather than deciding questions one, two, and three, the Board avoided them by saying in effect that, although it is debatable that the Cockeysville Marble formation is more susceptible to contaminants than other subsurface formations, Cockeysville Marble is found in other parts of the R.C. 2 zone, and therefore there was insufficient evidence that the potential adverse effect on the groundwater caused by the golf course would be greater at the proposed site than elsewhere in the R.C. 2 zone. As VPC correctly points out, this finding does not comport with the test set forth in *Schultz.* Assuming that Cockeysville Marble *is* more susceptible to contamination, the mere fact that *some* of the land elsewhere in the R.C. 2 zone is underlain with Cockeysville Marble does not mean that the

---

**31.** Our review of the transcript reveals that Ms. Hau testified that, in terms of water *quantity,* "there is not going to be any adverse impact to the groundwater resources." We do not find an equivalent statement in her testimony regarding groundwater quality. Instead, she stated that there is a "minimal possibility" of groundwater contamination. As we noted above, however, the Environmental Impact Report stated that the golf course "will not have adverse impacts to the groundwater."

effect would be no worse at this locality than elsewhere in the zone.

We, therefore, will remand the case to the circuit court with instructions to remand the case to the Board to resolve certain questions. If the Board, in answer to any of the questions that we have numbered one, two, or three, believes that the proposed golf course does not pose a threat to water quality in the aquifer, the Board should say so and the legal problem would be resolved. If, on the other hand, it believes that the proposed golf course does pose a threat to the aquifer's water quality because it is above Cockeysville Marble, then the Board should determine how much of the off-site portion of the comparable R.C. 2 zone is underlain by that subsurface formation.[32] *If* all or a substantial portion of the off-site R.C. 2 land is underlain by Cockeysville Marble then it is at least possible that the Board could fairly conclude that the golf course, at its proposed site, would cause no more contamination to the aquifer than if it were located elsewhere in the R.C. 2 zone.[33] Conversely, if the Board finds that only a relatively

---

32. VPC cites a portion of Mr. Mogilnicki's testimony to suggest that only 10% of the total acreage in the R.C. 2 zone is underlain by Cockeysville Marble. VPC says that, given this figure, groundwater in 90% of the possible sites in the R.C. 2 zone would be subject to lesser adverse impact because those sites are underlain with different, and less vulnerable, geologic formations.

Mr. Mogilnicki did not testify that only 10% of the *R.C. 2* zone is underlain by Cockeysville Marble. Rather, he said that about 10% of the *R.C. zones, i.e., R.C. 2 and other R.C. zones,* in Baltimore County are underlain by Cockeysville Marble. Mr. Mogilnicki also testified that the "Cockeysville marble area is principally R.C. 2." These observations possibly suggest that whereas the Cockeysville Marble underlies less than 10% of the areas in some of the other R.C. zones, this rock formation is found in the R.C. 2 zone at some percentage greater than 10%.

33. There is a possibility that, if a substantial percentage of the R.C. 2 zone is underlain by Cockeysville Marble, the Board's statement *might* satisfy the *Schultz* test.

If we assume, *arguendo,* that a substantial percentage of the R.C. 2 zone is underlain by Cockeysville Marble, then placement of the golf course at the proposed site might not adversely affect the groundwater to a greater extent than if the country club were placed elsewhere in the zone. If a significant percentage of other areas in the zone were also

small portion of the off-site R.C. 2–zoned land is underlain with Cockeysville Marble, and if it also finds that the Cockeysville Marble formation makes the aquifer more susceptible to contamination, then it cannot be said that the golf course at the intended site would pose no greater danger to groundwater than if it were located elsewhere in the R.C. 2 zone.

4. *Impact of the Proposed Use on Historic Hayfields Farm and the National Register Historic District*

The premise of VPC's next argument is that the Board did not evaluate the potential harm to the historical value of the Farm itself and of the Western Run—Belfast Road National Register Historic District caused by Hayfields' proposed development. VPC's concern is based on the fact that the Farm: (1) contains seven structures listed on the County's "Landmarks List"; (2) is the gateway property of the Western Run—Belfast Road National Register, a district known for its agricultural significance; and (3) is the "premiere agricultural site" in the County because of its agricultural history. VPC states that the Board, instead of considering the on-site or off-site detriments of historical significance, "concluded that Hayfields is *only* required to follow Baltimore County's Development Regulations calling for review of proposed alterations to historic structures in the subsequent Development Plan process by the Landmarks Preservation Commission and Planning Board."

First, as we already have discussed at length, on-site detriment is not to be considered under the *Schultz* test. It is the off-site loss potentially sustainable by the Western Run—Belfast Road National Register Historic District that we now consider.

 Under BCZR § 502.1(a), a special exception use is prohibited if it is "detrimental to the health, safety, or *general welfare* of the locality involved." (Emphasis added.) We

---

underlain by the same geologic formation, any adverse effect felt at the proposed site would likely be felt at other sites as well.

accept the premise that the preservation of historically significant structures, land, and districts promotes the general welfare. But, as we have stated previously, to warrant the denial of a petition for special exception, the detriment to adjoining or surrounding properties at the instant site must be different from the detriment that would occur elsewhere in the zone. *Schultz,* 291 Md. at 15, 432 A.2d 1319. "If the evidence makes the question of harm or disturbance . . . fairly debatable, the matter is one for the Board to decide." *Id.* at 11, 432 A.2d 1319; *see also Sharp,* 98 Md.App. at 82, 632 A.2d 248 (quoting *Holbrook,* 314 Md. at 218, 550 A.2d 664).

██ The "fairly debatable" standard is in accord with the "substantial evidence" standard of review. *See Evans,* 112 Md. App. at 298, 685 A.2d 454 (citing *Umerley v. People's Counsel,* 108 Md.App. 497, 503, 672 A.2d 173, *cert. denied,* 342 Md. 584, 678 A.2d 1049 (1996)). These standards ensure that judicial review is limited to " 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached; this need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.' " *Holbrook,* 314 Md. at 218, 550 A.2d 664 (quoting *Supervisor of Assessments v. Ely,* 272 Md. 77, 84, 321 A.2d 166 (1974)). Under this standard, we afford deference to the Board's findings of fact and applications of law to fact.

The Board said that it recognized

that any proposals such as the country club will have an effect on the surrounding vicinity. The question, once again, is whether those effects will be greater here than elsewhere in the zone. The instant site is at the edge of the urban/rural demarcation line, and is bounded by Interstate 83 to the east, which sees substantial large-scale commercial development at elevations much higher than the existing site. Were this project placed elsewhere in the R.C. zone, the effects of increased traffic, impact on views, other natural opportunities, and so forth, would be far greater as opposed to this location. Concerning the historic nature of the manor house and other structures on the site, the

Petitioner proposes to adaptively reuse all such structures in the development of the country club. Nowhere in the zoning regulations is a Petitioner compelled to maintain an historic structure "as is"; a Petitioner is only required to follow the development regulations and work within those regulations as they may pertain to historic structures, and whatever interaction as may be required with the Landmarks Preservation Commission.

The Board held that the country club at the proposed site will not have a greater adverse impact on the general welfare of the surrounding vicinity than if it were located elsewhere in the zone.

Testifying on behalf of VPC were Ruth Mascari, Chair of the Baltimore County Landmarks Preservation Commission, and James T. Wollon, Jr., an architect specializing in historic preservation.[34] Ms. Mascari testified that the development of the proposed project on the Farm "will have an extremely adverse impact on the Western District." Mr. Wollon drew a similar conclusion.[35] He delineated various changes he believed would result in adverse effects on the historic district, which were: [36]

---

**34.** Mr. Wollon prepared the historic district nomination papers for the Western Run—Belfast Road National Register Historic District.

Once a nomination form nominating a district to the National Register is completed by a local jurisdiction, it is reviewed by the state before being sent to the National Park Service.

**35.** According to Mr. Wollon, the standards for nomination to the National Register of Historic Places for a district require that the district contain a substantial number of historic sites and structures that "have not been altered beyond their point of being significant" and *not* contain a substantial number of sites and structures that "would detract from the historic quality of that district."

**36.** The amici offer a similar argument. In their brief, they state:

[T]he loss of Hayfields as a farm to a commercial country club complex affects the entire [Western Run—Belfast Road Historic] [D]istrict. It is no longer a district composed solely of rolling hills and farms but now has a commercial country club located at its premier entrance. The idea of the setting or scene applies to the Hayfields buildings as well. Historically, the Hayfields residence and farm buildings were situated in the middle of a farm. Take the

(1) losing the property's open vistas;

(2) modifying the property's historic structures;

(3) following development, the Farm "will no longer be a farm" and "will no longer look like a farm"; and

(4) "remov[ing] the property . . . [will] remove the setting of the historic house."

The Farm's manor house "happens to be the biggest of all the houses in th[e] [historic] district" and the Farm is "the first site seen upon the most common entrance to the district," ·according to Mr. Wollon. He also testified that the Western Run—Belfast Road and Worthington Valley historical districts[37] were "outstanding historic districts" and that "the qualities that make them qualify in the first place are still there, and they are very rare and outstanding for the whole Baltimore region."

VPC contends that the Board "cop[ped] out" and "abdicated its responsibility to consider matters of adverse historic impact in passing on special exception applications, by holding that its authority to rule on land use impacts and changes must be entirely jettisoned and replaced solely by the Landmark Commission's more limited authority relative to development plan and building permit details." We disagree. Although the Board did not say explicitly that, *in terms of the Western Run—Belfast Road Historic District,* the adverse effects of the proposed development of the instant site were no greater than those that would occur in other areas of the zone, it did make findings with regard to each of the factors that Mr. Wollon raised in his testimony.

To satisfy VPC's concerns regarding the third and fourth of Mr. Wollon's factors, the Board would have to have required Hayfields to preserve the agricultural character of the Farm. The only way to accomplish this objective is to require Hay-

---

setting or scene away from them and you have an obvious effect on the buildings themselves.

**37.** Although not part of the Worthington Valley District, the Farm also serves as this district's "primary entrance."

fields to continue farming on the tract or not to permit them to do anything with the property that would preclude farming. But, as the Board recognized, Hayfields cannot be forced to continue its farming operation. To forestall any non-agricultural use, simply to achieve the goal of agricultural preservation, raises the "takings" spectra.

Whether there was significant loss of open vistas was "fairly debatable" because there was substantial evidence in the record to support the Board's finding that

> [t]he instant site is at the edge of the urban/rural demarcation line, and is bounded by Interstate 83 to the east, which sees substantial large-scale commercial development at elevations much higher than the existing site. Were this project placed elsewhere in the R.C. zone, the effects of increased traffic, *impact on views*, other natural opportunities, and so forth, would be far greater as opposed to this location.

(Emphasis added.)

Finally, the Board did not err in holding that Hayfields' proposal to reuse adaptively the historic structures on the site would preserve, to a satisfactory degree, the historic nature of these structures. The only way to satisfy VPC on this issue would have been to require the property owner to continue farming to keep the buildings in their proper historic setting. Again, the Board does not have the authority to enforce such a requirement.

 We conclude that there was sufficient evidence in the record to make the potential impact on general welfare fairly debatable and, therefore, the issue was one for the Board to decide. We hold that the Board adequately reviewed the impact of the proposed development on the relevant vicinity, which includes the National Register Historic District.

### 5. *Burden of Proof*

VPC argues that, based on two isolated statements contained in the Board's opinion on the environmental impacts of

the proposed development, the Board improperly imposed the burden of proof, under BCZR § 502.1 and *Schultz,* on VPC rather than on Hayfields. VPC quotes the following excerpts from the Board's opinion: (1) "Therefore, the Board finds there was insufficient evidence that the potential effects on the subsurface formations and groundwater would be greater at the instant site than elsewhere in the zone"; and (2)

> The effects of the [golf course] well on neighboring properties were not demonstrated as likely to be worse here than at other locations in the R.C. zone. Therefore, this Board finds that there was insufficient evidence that the proposed use would have a greater detrimental impact to the health or safety of the vicinity at this location.

 Because we are remanding the case regarding the environmental impact issue, we note it is clear that the *Schultz* test does require the *applicant* (i.e., Hayfields) to show, under BCZR § 502.1(a), that the use for which the special exception is requested will not be "detrimental to the health, safety, or general welfare of the locality involved." [38]

 Additionally, VPC declares that because the Board incorrectly placed the burden of proof on it with respect to the environmental issues "[t]his supports an inference that the Board similarly misplaced the burden of proof throughout its Opinion." VPC provides no support for its assertion. We find none and reject the assertion. A review of the Board's entire decision leads us to believe that the Board was guilty, at most, of merely inartful word usage and was well aware of the burden of proof requirements of BCZR § 502.1(a).

---

**38.** The Court in *Schultz* explained:

> Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden.

*Schultz,* 291 Md. at 11, 432 A.2d 1319.

### 6. *Conditions on Practice Facility/Driving Range*

VPC appeals from the circuit court's reversal of two of the Board's limitations on the use of the practice facility/driving range. The conditions at issue here (1) limit the use of the driving range to people who are using the golf course or who are members, and (2) limit to 15 the number of practice tees that can be in operation at one time.

The Board held that a practice range is "a natural and appropriate facility" in conjunction with a golf course but noted that a driving range is not permitted as a special exception use in an R.C. 2 zone. According to the Board, therefore, the practice facility would have to serve a *subordinate use* to the country club. Given the subordinate use requirement, the Board restricted the use of the practice facility to those who are preparing to play (or ending a round of play) on the golf course or to those who are members. Following the imposition of this limitation, the Board stated that "[i]n light of the limited use expected on the practice facility, no more than 15 tees shall be available for use at any one time."

The parties have chosen different methods by which to analyze this issue. VPC conducts a mixed "subordinate use" and "intensity of use" analysis, whereas Hayfields solely employs an "intensity of use" analysis.

> VPC asserts that the Board approved the driving range facility here as a *subordinate use* to the country club, and therefore placed certain conditions upon it. As each of the conditions are supported by evidence in the record and represent a reasonable effort by the Board to insure that the practice range would be subordinate to the golf course, and thus an "appropriate facility," the circuit court erred in striking the conditions relating to who may use the facility and the number of tees that may be used at one time.

(Citation to the record omitted.) VPC then proceeds with the observation that because the driving range was approved as a subordinate use, "the intensity of use of the driving range

must be commensurate with, if not subordinate to, the use of the golf course." A similar conclusion was drawn by VPC in regard to the limitation of the number of tees available for use at one time. Finally, VPC contends that these conditions were imposed by the Board "for the protection of surrounding and neighboring properties." [39]

In contrast, Hayfields argues that the Board already recognized the practice range as an "appropriate facility." Given this fact, the only issue before the Board regarding potential conditions it could place on the facility concerned its "intensity of use." This analysis required the Board to find, under BCZR § 502.2, that the conditions it intended to impose were "appropriate or necessary to protect the surrounding properties." [40] In Hayfields' view, because the Board failed to make such findings, the circuit court properly struck the conditions.

■ With respect to the restriction on who can use the practice facility, the proper analysis is one of "subordinate use." Under BCZR § 101, "country club" is defined as "[a] 9 or 18–hole golf course with a clubhouse and other appropriate facilities." (Emphasis added.) Given the fact that a driving range is not permitted as a special exception use in an R.C. 2 zone, the Board reasonably imposed this "use condition" to ensure that the driving range does not become "a free-standing public attraction."

■ We take a different approach in considering the Board's restriction on the number of practice tees. Once the Board determined that the *non-public driving range* was an "appropriate facility" in conjunction with the proposed golf course, subsequent conditions placed on the driving range must meet the criteria under BCZR § 502.2. The Board made

---

**39.** This sentence is relevant in the "intensity of use" analysis under BCZR § 502.2.

**40.** BCZR § 502.2 grants the Zoning Commissioner (and the Board, on appeal) the authority to impose conditions in granting a special exception "as may be deemed necessary or advisable *for the protection of surrounding and neighboring properties.*" (Emphasis added.)

no finding that the restriction to 15 tees was necessary or appropriate for the protection of surrounding and neighboring properties. Therefore, the circuit court properly struck this condition.

### 7. Definition of "Country Club"

The Board denied VPC's motion for dismissal, which alleged that Hayfields proposed an "improper" country club.[41] The Board determined that the Baltimore County Council's use of the word "club" in Council Bill No. 62–78 (1978), which added the definition, of, *inter alia,* "country club" to the BCZR definitions section, does not require the country club to be open to members only. VPC argues that the term "country club" as used in the BCZR should be construed as meaning a "non-profit facilit[y] operated exclusively for use by members and their guests." Under this definition, VPC contends that the Board's approval of the special exception was improper.

BCZR § 101 defines "country club" as "[a] 9 or 18–hole golf course with a clubhouse and other appropriate facilities, which may include other recreational facilities *(see Section 406A )*." (Emphasis added.) The basis for VPC's argument is that because of the cross-reference to BCZR § 406A, which defines "neighborhood tennis club" as a non-profit association for members and guests only, the County Council intended the word "club" to denote a non-profit, exclusive facility. Apparently because (1) both the definitions of "country club" and "neighborhood tennis club" were added to the zoning regulations by the same bill, and (2) the term "club" is common to both "country club" and "neighborhood tennis club," VPC believes that the non-profit, private membership requirements of tennis clubs under BCZR § 406A are applicable to country clubs under BCZR § 101.

We disagree with VPC's analysis. Under the plain language of BCZR § 101, there is no limitation on the term

---

41. The Board reserved on this motion until all of the evidence had been presented and rendered its decision prior to deliberating the merits of the case.

"country club." The County Council, however, did impose a limitation when it adopted the definition of a "neighborhood tennis club." If the drafters of the Baltimore County Zoning Regulations had wanted to define "country club" as being limited to a non-profit and exclusive entity, it is logical to believe that it would have used language similar to that employed in BCZR § 406A. *Cf. Foor v. Juvenile Servs. Admin.*, 78 Md.App. 151, 162–63, 552 A.2d 947 (interpreting that the legislature's omission of terminology they used in earlier counterpart provisions was not the "product of inadvertence"), *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989). Because the drafters did not limit the term "country club" in this fashion, we interpret the term to encompass country clubs open to the general public.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO REMAND THE CASE TO THE BALTIMORE COUNTY BOARD OF APPEALS FOR FURTHER ACTION CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID 15% BY APPELLANT AND 85% BY APPELLEES.**